UNITED STATES, Appellant

v.

LEVERN VICTOR EGGERS, Engineman Third Class,
U. S. Navy, Appellee

3 USCMA 191, 11 CMR 191

No. 1990

Decided August 7, 1953

CDR E. C. Gordon, USN, for Appellant.
CDR Francis X. Driscoll, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Eggers, was convicted under four specifications alleging the utterance of a forged writing, and four specifications alleging forgery.[1] After approval of the findings and sentence by the convening authority the case was considered by a board of review. That body reached the conclusion that two specimens of handwriting, procured from accused before trial, and introduced in evidence over his objection, violated the privilege against self incrimination secured to accused persons under Article 31(a) of the Uniform Code of Military Justice.[2] Thereupon it set aside the findings and sentence and ordered the charges dismissed. Thereafter The Judge Advocate General, United States Navy, certified to this Court two questions:

"(a) Whether the testimony of Ernestine Lagos, recorded at the pretrial investigation, was properly admitted in evidence at the trial as former testimony?

"(b) Were Prosecution Exhibits 8 and 9 properly admitted in evidence by the Law Officer?"

## II

Turning to the first question raised, only the following facts are required as necessary background. ▮▮▮▮▮ ▮ Ernestine Lagos, a woman companion of the accused, had accompanied him on what appears to have been a lengthy and elaborate "spree," which produced the allegedly forged checks underlying the charges in the case before us. In fact, she had assisted personally in the cashing of at least one of the checks in question. She had been interrogated fully during the course of a pretrial investigation of the present charges, where her testimony had been recorded verbatim. Accused and his counsel were present at this investigation, and subjected Miss Lagos to searching cross-examination with respect to the evidence she gave. Before the trial was held, however, the young lady died. Thereafter, trial counsel offered in evidence a transcription of her testimony at the pretrial investigation, and—over objection by the defense—the law officer permitted counsel to read its contents into the record of trial.

Did the law officer err in this particular? We believe that he did not. It is apparent that we meet here a challenged application of the apparent exception to the hearsay rule often referred to as "reported testimony." The exception, of course, is only *apparent* for the reason that as a matter of theory, the guaranties contemplated by that analytic rule have been satisfied, and, as a consequence, reliance is not placed on some surrogate therefor. Although the general principle is not the subject of treatment in the Uniform Code, a specific manifestation thereof is dealt with in Article 50(a)[3] which is set out below:

"(a) In any case not capital and not extending to the dismissal of an officer, the sworn testimony, contained in the duly authenticated record of proceedings of a court of inquiry, of a person whose oral testimony cannot be obtained, may, if otherwise admissible under the rules of evidence, be read in evidence by any party before a court-martial or military commission if the accused was a party before the court of inquiry and if the same issue was involved or if the accused consents to the introduction of such evidence."

---

[1] The offenses alleged were committed prior to May 31, 1951, so both charges were laid under Article 22, Articles For the Government of the Navy, 34 USC § 1200, Art 22. The trial, however, was held after the effective date of the Uniform Code of Military Justice, so is governed by the Code and the Manual for Courts-Martial, United States, 1951.

[2] 50 USC § 602(a).

[3] 50 USC § 625(a).

The Manual for Courts-Martial, United States, 1951, however, deals with the matter somewhat more broadly, and provides as follows in paragraph 145b:

"When at any trial by court-martial . . . it appears that a witness who has testified in either a civil or military court at a former trial of the accused in which the issues were substantially the same . . . is dead, . . . his testimony in the former trial, if properly proved, may be received by the court if otherwise admissible, except that the prosecution may not introduce such former testimony of a witness unless the accused was confronted with the witness and afforded the right of cross-examination at the former trial . . . ."

It is perfectly clear, therefore, under the quoted Manual language, that, had Miss Lagos testified under circumstances identical to those obtaining here, but at a previous *court-martial hearing* of charges against the accused, the action taken by the law officer below would have been eminently correct. But she had not done this. Instead, the offered record of her testimony was made during a pretrial investigation of the very charges under which the accused was tried in the case at bar. Should the presence of this difference produce another result? We think not. After speaking of the common law principles underlying the doctrine of reported testimony, Dean Wigmore mentions the existence of numerous statutes operative in the area under consideration. In speaking of this legislation, however, he makes the following point:

". . . But it is worth noting that usually the effect of the common-law principle would be *even broader than the statutes' terms,* and would suffice to admit even where the case is not covered by the phraseology of the statute; *i.e. the statute merely secures admissibility in certain instances, and is not intended to forbid admission in other instances.*"[4] (Emphasis supplied].

---

[4] 5 Wigmore on Evidence (3d ed.) § 1387.

Following the Wigmore approach, we are of opinion that the omission from the Code or Manual of a specific reference to the use of reported testimony, secured during the course of a pretrial investigation, is not necessarily fatal to the law officer's ruling in the present case. This is certainly true if evidence coming from such a source may be said to meet the tests provided as a guaranty of trustworthiness in the case of reported testimony having other origins. In our view the record offered here *does* meet these tests. Certainly the testimony was cross-examined, searchingly and at length, by the very party-opponent against whom it is now offered; and—despite the promptings of appellate defense counsel—it certainly dealt with the very issues involved in the case at bar, that is, with the general question of whether accused forged and uttered the documents with which the present case is concerned. As a matter of theory we can conceive of no sound objection to it. Scrutinized through other spectacles however, it has been urged on us that, in terms of realism, the challenged testimony was not in point of fact cross-examined by one with an interest and motive identical with that of the accused at the trial— and this despite his presence on both occasions. The notion here seems to be, of course, that the tactical objectives of a cross-examining defense counsel at the pretrial investigation are likely to be quite different from those of the same counsel at the court-martial hearing. At the stage of investigation, it is said, he is not principally concerned with testing, but rather with discovery, whereas at the trial he is serving a wholly different purpose. The result of all this—the argument continues—is that, were we to condone the reception of the record offered here, we would be placing our stamp of approval on the admission—and in the face of objection —of a mere sworn statement inadequately tested by cross-examination.

There is, indeed, something to be said for the argument—but not enough, we believe. In the first place, we do not think that the difference between the attitudes of defense counsel on these

two occasions is as great as has been supposed. Moreover, the proposed analysis of the situation is at the same time too elaborate and sophisticated for practical use, and much too preoccupied with the tactics of advocacy. It is doubtless true—as has been said—that cross-examination is "the greatest legal engine ever invented for the discovery of truth."[5] At the same time cross-examination is nowhere *required,* but only the *opportunity* for its exercise. If, in pursuit of some real or fancied strategical advantage of his own, counsel sifts direct examination inadequately at a preliminary stage of the proceedings, he should not be heard to complain when, in a proper case, it confronts him later at the trial. Discovery is not a prime object of the pretrial investigation. At most it is a circumstantial by-product—and a right unguaranteed to defense counsel.

We believe that an identical conclusion is indicated when we consider the problem in terms of alternatives. Is it better to exclude reported testimony in the present setting for the reasons proposed, or to admit it despite its conceivable—and modest—shortcomings? Exclusion will often result in a failure of proof and in unrequited crime. And admission we believe is wholly safe —fully as safe, we are sure, as is reception under numerous hearsay exceptions in which cross-examination plays no part at all. We have every wish to protect accused persons fully, and in close cases have been willing to resolve doubts in their favor. We are sure we will continue to do these things. However, we are mindful that courts sit as well to convict the guilty as to acquit the innocent. The administration of criminal justice, as we have said before, is not a fox-hunt—and rather different ground rules must obtain. In concluding as we do with respect to this branch of the case, we need go no further than we are taken by the present facts. Therefore, we prudently leave for future consideration questions involving pretrial testimony less thoroughly sifted than was that involved there—or

[5] 5 Wigmore on Evidence (3d ed.) § 1367.

wholly uncross-examined, although an opportunity for such testing has been afforded. On these and related matters we express no opinion.

We conceive that the pretrial investigation in military practice may properly be identified with the preliminary hearing of criminal law administration in the civilian scene. The following authorities from the latter area support fully the law officer's ruling in the case at bar: Mattox v. United States, 156 US 237, 39 L ed 409, 15 S Ct 337; Motes v. United States, 178 US 458, 44 L ed 1150, 20 S Ct 993; United States v. Angell, 11 F 34; United States v. Greene, 146 F 796; Baldwin v. United States, 5 F2d 133, 134 (CA 6th Cir); Kemp v. Government of Canal Zone, 167 F2d 938.

### III

The second question related to the admissibility in evidence over objection of Prosecution Exhibits 8 and 9, which were handwriting specimens obtained from the accused prior to trial unwillingly and through use of an order. In its disposition below, the board of review held that admission of these exhibits contravened the privilege against self incrimination secured to the accused through Article 31(a) of the Code, supra:

"No person subject to this code shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him."

Paragraph 150b of the Manual, supra, with regard to the privilege against self incrimination, states that:

"The prohibition against compelling a person to give evidence against himself relates only to the use of compulsion in obtaining from him a verbal or other communication in which he expresses his knowledge of a matter and does not forbid compelling him to exhibit his body or other physical characteristics as evidence when such evidence is material. Consequently, it is not a violation of the prohibition to order a person (includ-

ing an accused) to expose his body for examination by the court or by a physician who will later testify as to the result of his examination. Upon refusal to obey the order, the person's clothing may be removed by force. Also, *the prohibition is not violated by requiring a person* (including an accused) to try on clothing or shoes, to place his feet in tracks, *to make a sample of his handwriting,* to utter words for the purpose of voice identification, or to submit to having fingerprints or a sample of his blood taken." [Emphasis supplied].

The board of review was of the opinion that—at least in so far as it touches the furnishing of handwriting samples —the above Manual paragraph applies only to the trial proper—so that one might lawfully be compelled to supply such a specimen only on cross-examination where, for example, he had denied on direct that a signature in question was his own. It concluded that since accused did not furnish the samples presented in this case voluntarily, their admission in evidence was in violation of Article 31(a), supra. We have experienced some difficulty in following completely this course of reasoning, but we believe we perceive what was in the mind of the board.

As we see it, paragraph 150b, supra, applies to a handwriting specimen secured at any time—whether before or during trial. If secured in accordance with law in the first instance, it is admissible in evidence, no matter how strenuously the accused may object, at the hearing. The question then—very simply—is whether the Manual's statement that an accused may be compelled to furnish a sample of his handwriting is in conflict with the privilege against self incrimination secured to him under Article 31(a) of the Uniform Code. If there is inconsistency, then, of course, the provisions of the Code must prevail. United States v. Sylvester Clark, 1 USCMA 201, 2 CMR 107, decided February 29, 1952; United States v. Wappler, 2 USCMA 393, 9 CMR 23, decided April 15, 1953; United States v. Gann and Sommer, 3 USCMA 12, 11 CMR 12, decided July 3, 1953.

Congress' enactment of Article 31(a) "extends *the* privilege against self-incrimination to *all persons* under *all circumstances.*" (Emphasis supplied). Index and Legislative History, Uniform Code of Military Justice, HH 984, HR 19, SH 108, SR 16. Undoubtedly, it was the intent of Congress in this division of the Article to secure to persons subject to the Code the same rights secured to those of the civilian community under the Fifth Amendment to the Constitution of the United States—no more and no less. Accordingly, we must turn for guidance to the cases decided under that Amendment, and perhaps as well to decisions construing similar provisions of state constitutions.

In examining ostensibly applicable civilian authorities—of which there is a plethora—it is necessary to eliminate at the outset many, which, on their facts, do not bear directly on the issue of whether one's guarantee against self incrimination includes the right to refuse to execute a specimen of handwriting. For instance, all those in which the defendant voluntarily—albeit on request—wrote his name or other matter, must be put aside. The accused here supplied the samples with which we are concerned *under express protest.* Likewise, those cases involving a writing demanded of a defendant on cross-examination, following assumption of the witness stand, are inapplicable. In that situation, of course, the defendant had waived his privilege by taking the stand. This weeding-out process leaves relatively little case material directly in point.

Before turning to the authorities which seem apropos, we must once more point to an essential distinction between general civilian rights and those which surround an accused military person prior to trial. In the civilian community, as a rule, arresting officers are not obliged to warn a suspect of his privilege against self incrimination. However, in the military scene the Code expressly requires warning before any information relating to a suspected offense may be sought—and also provides that information secured without such warning is inadmissible

in evidence. Uniform Code, supra, Articles 31(b), (d), 50 USC §§ 602(b), (d); United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48, decided February 27, 1953. For all practical purposes, therefore, one in the custody of the military authorities is from the moment of his apprehension—even before—cloaked with the same rights and guaranties which would attach to his civilian brother seated in a courtroom and on trial.

With this in mind, we turn to what is—so far as our extensive investigation has revealed—the only case directly in point, Beltran v. Samson and Jose, 53 Phil. Is. 570. There, the prosecuting attorney had secured from a trial judge an order requiring a prospective accused in a forgery case to write from dictation the contents of a questioned document. On application for a writ of prohibition by the petitioner—the prospective defendant—the Supreme Court of the Philippine Islands ruled that the order violated the petitioner's privilege against self incrimination and issued the writ sought. Its members viewed the order as leading to a more serious abridgment of the privilege than would be present in requiring one to produce chattels or documents in his possession which might be used against him. Unquestionably the latter would constitute a violation of one's guaranty against self incrimination, where the documents or chattels are not kept or possessed by the individual in question under a requirement of the law. United States v. White, 322 US 694, 698, 88 L ed 1542, 64 S Ct 1248, 152 ALR 1202.

In the Federal field we have been able to descry but a single—and faint—guiding light on the specific point. In Dean v. United States, 246 F 568, 577 (CA 5th Cir), the court, and by way of dicta, referred to "The defendant's constitutional privilege of refraining from giving evidence against himself by word of mouth, *or by furnishing specimens of his handwriting.*" (Emphasis supplied). Turning to the states, we find that in Kennison v. State, 97 Tex Cr R 154, 260 SW 174, the Court of Criminal Appeals ruled that a handwriting specimen secured from the defendant while in custody, and awaiting trial, was improp-

erly admitted in evidence, for the reason that the defendant had not been warned —prior to giving the writing—of his privilege against self incrimination. Behind this reasoning, of course, is the assumption that the matter *was* within the defendant's privilege—for, if it had not been, no warning would have been required. It should be noted that Texas, in its demand that accused persons be properly warned, is closer to military procedure than to that prevailing in the majority of sister states. The specific result in the Kennison case certainly would not have obtained in most civilian jurisdictions, where no warning is required. It should be reported, however, that one premise of the Kennison case appears to have been shaken somewhat by a subsequent opinion of the same court in Cox v. State, 126 Tex Cr R 202, 70 SW2d 1005. In the latter case —although it is difficult for one unfamiliar with Texas procedure to determine the precise basis of the decision— it does appear that a failure to afford the defendant due warning was not considered to be of paramount importance. However, in Cox, the court expressly caused to appear the notion that the privilege against self incrimination included the right to refuse to execute samples of handwriting.

Turning aside for the moment from the rather incomplete picture left by the authorities most closely in point, let us review developments in related situations under the privilege against self incrimination. A number of settled exceptions to the privilege appear. One may be required to submit to having his fingerprints taken. United States v. Kelly, 55 F2d 67 (CA2d Cir). A defendant on trial may be compelled to don an item of clothing for the purpose of establishing that it belonged to him. Holt v. United States, 218 US 245, 54 L ed 1021, 31 S Ct 2, 20 Ann Cas 1138. Photographs of a suspect, taken at the time of his arrest, may be used by an identification witness at his trial where the accused had, after the date of the photograph, grown a full beard. Shaffer v. United States, 24 App DC 417. Although some difference of opinion exists, the weight of authority has approved action compelling a criminal de-

fendant to place his foot in a footprint. State v. Barela, 23 NM 395, 168 P 545; State v. Graham, 74 NC 646, Magee v. State, 92 Miss 865, 46 So 529. With few exceptions, all reported cases have taken the position that an accused person cannot refuse to permit himself to be seen by witnesses and the jury. People v. Gardner, 144 NY 119, 38 NE 1003; People v. Clark, 18 Cal2d 449, 116 P2d 56; Appelby v. State, 221 Ind 544, 48 NE2d 646. Still other narrowly defined exceptions have been developed in several jurisdictions which need not detain us here.

Against these exceptions we must consider and evaluate the rule ably stated by United States v. White, supra, that the privilege protects one from the compulsory production of personal documents and chattels for use in evidence against him, provided that such documents or chattels were not kept in accordance with legal requirements. Thus our question becomes whether a compelled specimen of handwriting belongs in the same pigeonhole with an unwilling submission to fingerprinting, a compulsory placement of a foot in a footprint, and the like—or whether it more properly should be considered as closely related to a compulsive delivery of some document or chattel in the possession of an accused for use in evidence against himself.

The Supreme Court of the Philippine Islands, in Beltran v. Samson and Jose, supra, made its position clear: it regards the compelled handwriting specimen as more clearly within the privilege against self incrimination than the mere production of documents and chattels. Texas and the Court of Appeals for the Fifth Circuit appear to be in accord. There does not seem to be a decision of any American jurisdiction to the contrary.

However, certain legal writers have taken a position in definite opposition to that of the court in Beltran v. Samson and Jose, supra. One says:

"A specimen of handwriting, obtained for purposes of comparison with a questioned document, can logically be considered as nothing more than mere physical evidence. It differs very little, in principle, from a 'fingerprint impression secured by compulsion for purposes of comparison with a fingerprint found at the scene of the crime.' . . ." [Inbau, Self-Incrimination, 46].

Dean Wigmore, in his treatise on evidence, recognizes the present problem, but—oddly enough—takes no positive position in the matter, although he does quote at length, and with apparent approval, from the opinion in Beltran v. Samson and Jose, supra. 8 Wigmore on Evidence (3d ed.) § 2265. However, this apparent equivocation is resolved in his Code of Evidence, where he states that, "To require a person . . . to write a sample of handwriting, is within the privilege." Wigmore's Code of Evidence, Rule 208, Art 3, Par (b), § 2349. Wharton appears to believe that the weight of authority precludes the compulsory confection of handwriting samples. Wharton's Criminal Evidence (11th ed.) § 819. However, the difficulty with this particular conclusion is that the authorities cited in its support do not at all stand for the proposition credited to them.

These comments have not eased our task perceptibly. The question remains: is action compelling one to furnish a handwriting specimen closer to requiring him to produce documents or chattels in his possession for use in evidence against him—or is it more nearly comparable to a demand that he submit to fingerprinting, that he place his foot in a footprint, and the like? If the former, then he is within the protection afforded by the privilege against self incrimination. If the latter, then the privilege is of no avail to him.

We believe the sound answer to be provided in Beltran v. Samson and Jose, supra, and in Wigmore's Code of Evidence, supra. Law enforcement authorities could *not* require a man to produce his diary—a pre-existing sample of handwriting—for use in evidence against him. United States v. White, supra. Would it then make anything but nonsense to say that the same man *could* be compelled to seat himself in the presence of the same authorities and to execute several pages in longhand? Cer-

tainly not. Indeed, there is a distinct difference between the present handwriting problem, on the one hand, and the fingerprint and the foot-in-footprint situations, on the other. The latter require only *passive* cooperation. whereas the former requires *active* participation and *affirmative* conduct in the production of an incriminating document not theretofore in existence. To the same effect is our decision in United States v. Rosato, 3 USCMA 143, 11 CMR 143, decided July 31, 1953.

Having taken the view that the protection of the Fifth Amendment extends to an involuntary handwriting specimen, it follows from what we have said previously that Article 31(a) of the Code includes the same coverage. Accordingly, that part of paragraph 150b of the Manual which provides to the contrary is of no effect, and it follows that the trial court erred in admitting in evidence samples of accused's handwriting taken from him involuntarily and before trial.

## IV

In accordance with the foregoing, the first certified question is answered in the affirmative and the second in the negative. We note that the board of review ordered the charges dismissed because it was "of the opinion that with this evidence [the handwriting specimens] excluded there is insufficient evidence to support the finding of guilty to any of the offenses charged." This is not a proper application of the criterion for determining whether a rehearing should be ordered. The Manual, supra, paragraph 92, makes clear that the test is whether there exists an available substitute for the evidence held inadmissible by the reviewing agency. Of course, if the evidence apart from that ruled inadmissible, is sufficient as a matter of law to sustain the conviction, there is no warrant for dismissal of the charges. In the present case there are almost certainly other examples of the accused's handwriting available. To afford the board of review an opportunity to reconsider its disposition of this case, the record is returned to The Judge Advocate General, United States Navy, for reference to the board of review for further consideration.

Chief Judge QUINN and Judge LATIMER concur.