GREGORY, Senior Judge:
Appellant was convicted, after mixed pleas, at a general court-martial bench trial of conspiracy to distribute marijuana in hashish form while on board a vessel, wrongful possession of hashish with intent to distribute while on board a vessel, and six specifications of wrongful distribution of hashish while on board a vessel, in violation of Articles 81 and 134, 10 U.S.C. §§ 881, 934, Uniform Code of Military Justice (UCMJ). He was sentenced to confinement at hard labor for four years, total forfeitures, reduction to pay grade E-l, and a dishonorable discharge. On initial review, all confinement in excess of three years and a discharge more severe than a bad conduct discharge were suspended for one year.
*487 In his petition before this court, appellant assigns the following as errors:
I. THE MILITARY JUDGE ERRED IN DENYING APPELLANT’S MOTION TO SUPPRESS THE FORMER TESTIMONY OF OS3 SCHULTZ AT THE ARTICLE 32 HEARING.
II. A SENTENCE WHICH INCLUDES AN UNSUSPENDED BAD CONDUCT DISCHARGE IS INAPPROPRIATELY SEVERE.
We have considered each of these assignments in order. With reference to the first, a brief discussion of the facts is necessary.
I
A. Facts
On 29 April 1983, on board USS DAHL-GREN (DDG-43), appellant and two companions, Fire Control Technician Third Class (Guns) (FTG3) Johnson and FTGSA Miltenberger, were apprehended in the MK68 Barbette[1] immediately after they allegedly sold approximately gram of hashish to Operations Specialist Third Class (OS3) Schultz who unbeknownst to them was making the buy at the behest of the ship’s Chief Master-at-Arms for purposes of apprehending them in the act.
On 27 May 1983, OS3 Schultz gave a detailed account of the buy and the alleged prior solicitation to buy hashish by FTGSA Miltenberger and FTG3 Johnson in a sworn statement to Naval Investigative Service (NIS) Special Agent King.
On 21 June 1983, a joint Article 32, UCMJ, hearing was convened to investigate charges against appellant, FTG3 Johnson, and FTGSA Miltenberger. Each of the accused was represented by his own detailed defense counsel. At the hearing, counsel for the Government called OS3 Schultz to testify. After identifying each of the accused, OS3 Schultz identified his statement of 27 May and manifested his desire to adopt it as his testimony. None of the defense counsel objected to consideration of the statement by the investigating officer. On direct examination, OS3 Schultz also described the bag from which he had chosen his piece of hashish as well as the presence óf numerous similarly wrapped foil pieces in the bag.
Pursuant to an agreement by the three defense counsel, counsel for FTGSA Miltenberger conducted the cross-examination as primary counsel for the purpose of the hearing, with the expressed intention that the other counsel could also ask relevant questions after his examination of the witness if they desired.
Primary defense counsel’s cross-examination consisted of presenting 0S3 Schultz with an unsworn statement which he had given to OSC Petty on 30 April 1983. OS3 Schultz adopted this statement as an additional statement. Counsel for the government did not object to consideration of this statement by the investigating officer. The statement, although largely consistent with that given four weeks later, differed in three important aspects. First, it did not state that OS3 Schultz went to the barbette and spoke with appellant and the other alleged co-conspirators prior to calling MAC Whelan. Second, there were discrepancies between the two statements regarding the times that certain events were alleged to have occurred. Lastly, the 30 April statement indicated that, in return for his participation in the “buy”, OS3 Schultz requested that he be given restriction rather than a fine or a reduction in rate at his pending Captain’s Mast.
When recalled by the defense as a witness at the Article 32 investigation, OS3 Schultz was asked by counsel for FTG3 Johnson how long he spent inside the barbette before the Chiefs arrived. He answered one to two minutes in accordance with what he had previously told counsel. This response differed from the time frame of several minutes given in his statements of 30 April and 27 May.
*488 At 0200 on 25 July 1983, OS3 Schultz absented himself without authority in Naples, Italy. A DD-553 was issued on 6 September 1983, and efforts were made by the trial counsel, NIS agents, and local police to locate OS3 Schultz at his home of record in New Jersey and at his parents’ home in Texas. Such efforts were unavailing.
At trial on 22 September 1983, trial counsel offered the verbatim transcript of OS3 Schultz’ testimony at the Article 32 hearing (including the two statements). Appellant’s individual military counsel objected on grounds of hearsay and lack of confrontation. Appellant’s first assignment of error is based on these same grounds.
Appellate government counsel, as did trial counsel at trial, contends that the testimony at issue falls within Military Rule of Evidence (Mil.R.Evid.) 804(b)(1) and that appellant was not denied his constitutional right to confrontation guaranteed by the Sixth Amendment.
B. Was The Article 32 Testimony Of OS3 Schultz Inadmissible Hearsay?
We first consider appellant’s argument that the testimony of OS3 Schultz was inadmissible hearsay. The issue from both the defense and Government vantage points revolves around the applicability of Mil.R.Evid. 804(b)(1). Mil.R.Evid. 804(b)(1) states the following:
(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) Former testimony. Testimony given as a witness at another hearing of the same or different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. A record of testimony given before courts-martial, courts of inquiry, military commissions, other military tribunals, and before proceedings pursuant to or equivalent to those required by Article 32 is admissible under this subdivision if such record is a verbatim record. This paragraph is subject to the limitations set forth in Articles 49 and 50.
At trial and before this Court, appellant has not questioned the “unavailability” of OS3 Schultz within the meaning of Mil.R. Evid. 804(a)(5) or the verbatim nature of the record of his Article 32 testimony. The crux of appellant’s argument is that counsel at the Article 32 did not possess the same motive to cross-examine the witness as he possessed at trial. Appellant also argues that new information regarding OS3 Schultz had come to light after the Article 32 hearing upon which counsel would have liked to have asked questions. The nature of the new information included OS3 Schultz’ fear of being fined or reduced in rate at his upcoming Captain’s Mast. The other new area was the presence of OS3 Schultz’ name and the numerals “80” found in a notebook belonging to appellant seized during a search of the barbette.
That this purportedly new information was readily within the overall general knowledge of the defense prior to the Article 32 hearing, we believe is clear beyond cavil. The defense, in fact, confronted OS3 Schultz at that hearing with his statement of 30 April in which his fears were expressed. Likewise, the defense was aware of the contents of the notebook, either through its ownership by appellant or through their knowledge of the investigation conducted by NIS and by MAC Whelan which had their genesis in the names contained in the book. Therefore, we believe that appellant’s assignment must ultimately stand or fall on the theory of either the dissimilarity of motive to cross-examine or the violation of the right to confrontation.
C. Did Appellant Have An Opportunity And Similar Motive To Develop The Testimony Of OS3 Schultz At the Article 32 Investigation?
1. Drafter’s analysis of Mil.R.Evid. 804(b)(1).
Appellant finds primary support for the general proposition that the motivation of *489 defense counsel to develop the testimony of a witness at an Article 32 may be different from that of the same counsel when faced with the same witness at trial in the drafter’s analysis of Mil.R.Evid. 804(b)(1). That analysis states the following:
Investigations under Article 32 of the Uniform Code of Military Justice present a special problem. Rule 804(b)(1) requires that “the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony” at the first hearing. The “similar motive” requirement was intended primarily to ensure sufficient identity of issues between the two proceedings and thus to ensure an adequate interest in examination of the witness. See, e.g., 4 J. WEINSTEIN & M. BERGER, WEINSTEIN’S EVIDENCE 11804(b)(1) [(04)] (1978). Because Article 32 hearings represent a unique hybrid of preliminary hearings and grand juries with features dissimilar to both, it was particularly difficult for the committee to determine exactly how subdivision (b)(1) of the Federal Rule would apply to Article 32 hearings. The specific difficulty stems from the fact that Article 32 hearings were intended by Congress to function as discovery devices for the defense as well as to recommend an appropriate disposition of charges to the convening authority. Hutson v. United States, 19 CMA 437, 42 CMR 39 (1970); United States v. Samuels, 10 CMA 206, 212, 27 CMR 280, 286 (1959). See generally, Hearing on HR. 2498 Before a Subcomm. of the House Comm, on Armed Services, 81st Cong., 1st Sess., 997 (1949). It is thus permissible, for example, for a defense counsel to limit cross-examination of an adverse witness at an Article 32 hearing using the opportunity for discovery, alone, for example, rather than impeachment. In such a case, the defense would not have the requisite “similar motive” found within Rule 804(b)(1).
The drafters apparently interpreted Congress’ enactment of Article 32 as serving two distinct functions, a discovery proceeding for the accused and as a probable cause hearing; the discovery aspect being at least co-equal if not preeminent in their minds. This interpretation, we believe, reflects a radical departure from the legislative history of Article 32 and prior military decisional law.
2. Legislative History.
As the drafters of the Military Rules of Evidence cited an excerpt from the Subcommittee hearings on the UCMJ as supportive of their interpretation, we have reproduced below that excerpt as well as other relevant portions of the same discussion:
Mr. Norblad. I think the one important factor to keep in mind on this is that this is not the trial. It is merely the preliminary investigation to satisfy the officer investigating that there is probable cause that the man did commit the crime and there is enough evidence to warrant that he should be put on trial.
They are not trying to decide whether he is guilty or innocent. So I don’t think it is so important here as it is in the trial of the case to have the witnesses available.
Mr. Larkin. What I said as applying here refers to the trial. I probably gave the wrong impression.
Mr. Norblad. Just like a hearing before a justice of the peace, to determine whether a man is being lawfully held or if there is enough evidence to try him.
Mr. Smart. A prima facie case.
Mr. Norblad. Yes.
Mr. Larkin. This I should say goes further than you usually find in a proceeding in a civil court in that not only does it enable the investigating officer to determine whether there is probable cause, as you point out Mr. Norblad, but it is partially in nature of a discovery for the accused in that he is able to find out a good deal of the facts and circumstances which are alleged to have been committed which by and large is more than an accused in a civil case is entitled to.
*490 But this (a) and (b) follow almost verbatim the present article of war 46, subsection (b), which I think as a matter of fact was considered by your committee last year.
Hearing on H.R. 2498 before a Subcomm. of the House Comm, on Armed Services, 81st Cong., 1st Sess., 997 (1949), (emphasis added).
Mr. Larkin. I think that is right, Mr. Elston. There has been a considerable amount of difficulty in construing the binding nature of the pretrial investigation as provided, and that has been provided in the Army I guess since 1920. The Federal courts on writs of habeas corpus have scrutinized it and some have held that the absence or the failure to hold a pretrial investigation may be such jurisdictional error as requires a reversal of the verdict after trial. The point we are trying to make clear is that the pretrial investigation is a valuable proceeding but that it should not be a jurisdictional requirement.
It is a valuable proceeding for the defendant as well as for the Government. We desire that it be held all the time. But in the event that a pretrial investigation, less complete than is provided here, is held and thereafter at the trial full and complete evidence is presented which establishes beyond a reasonable doubt the guilt of the accused, there doesn’t seem to be any reason when he has had his day in court and where it is clearly demonstrated that he is guilty, that despite that demonstration the case should be set aside if the lack of full compliance doesn’t materially prejudice his substantial rights.
Id. at 998.
Mr. Brooks. Well, Mr. Larkin, really the closest approach to what you have here is the hearing before a United States Commissioner, even more so than a hearing before a grand jury. There the procedure is similar to that set forth in these articles. Now I think it is fair and the record ought to show that Colonel Oliver of the Reserves felt like the requirements of subsection (d) which relate to jurisdictional error should be changed.
But the Federal rule is in accordance with the rule that we have discussed here.
Mr. Larkin. I think most State rules are, too. The procedure of most States is as you know that there are hearings before committing magistrates. But on the other hand grand juries can and do indict right out of hand without a preliminary hearing at all.
Mr. Brooks. A grand jury, too, is secret whereas your commissioner hearings are open.
Mr. Larkin. That is right.
Mr. Brooks. The grand jury proceedings normally contemplate in civilian Federal courts that the defendants or the accused not be present normally.
Mr. Larkin. That is right.
Mr. Brooks. Whereas in your commissioner hearings it is the reverse and the accused is present.
Mr. Larkin. That is right.
Mr. Brooks. He is confronted with witnesses and has an opportunity to question them.
Mr. Larkin. That is right.
Mr. Brooks. And he must be advised that he is entitled to counsel and that his testimony may be used against him and that he gives it freely.
Mr. Larkin. That is right.
Mr. Brooks. Without hope of reward or fear of punishment.
Id. at 1000-01.
The focus of the discussion, brief though it may be, was clearly not upon the creation of a discovery mechanism for the accused, but rather the creation of a procedure for determining the existence of probable cause and the appropriate forum. The Subcommittee was also concerned that failure to comply strictly with the dictates of Article 32 not constitute a jurisdictional error. The procedures by which this investigation was to be conducted (right to counsel, presentation of evidence on accused’s behalf, right to cross-examination) created *491 as an essential by-product an opportunity for an accused to learn more about the case against him to an extent relatively unknown in the civilian criminal courts. In that sense, it presented an opportunity for discovery. It is by no means clear that the drafters of the Code intended that this opportunity be divisible from the rest of the investigatory procedure or that its status be any more significant than a partial or secondary result of the primary probable cause/appropriate forum hearing.
3. Case Law.
If any questions could be raised as to the relationships between the discovery and probable cause/appropriate forum aspects of the Article 32 hearing, as well as to the dissimilar motivation theory, they were quickly laid to rest by the seminal case of United States v. Eggers, 3 U.S.C.M.A. 191, 11 C.M.R. 191, 193-94 (1953).
The Court of Military Appeals in Eggers was faced with an issue almost identical to that presented in the case at bar. At the Article 32 investigation, a woman companion of the accused who had accompanied him on his “spree” testified for the government. Before the trial was held, she died. At trial, the transcript of her testimony was read into evidence.
In its decision, the Court of Military Appeals conceded that neither the Code nor the Manual for Courts-Martial, 1951 (MCM, 1951), specifically included prior Article 32 testimony within a hearsay exception for “reported testimony.” See e.g., Article 50(a)(3), UCMJ (proceedings of a court of inquiry); 111456, MCM, 1951 (testimony at a former trial of the accused). However, the Court, drawing on common law principles, found that if such testimony met the tests of trustworthiness applicable to other types of reported testimony, that is, it was subject to cross-examination by same party-opponent, and that it dealt with the same issues involved in the ease on the merits, it would be admissible.
Appellant, in that ease, argued that the testimony was not “cross-examined by one with an interest and motive identical with that of the accused at the trial; ” the notion being that “the tactical objectives of a cross-examining defense counsel at the pretrial investigation are likely to be quite different from those of the same counsel at the court-martial hearing.” At the stage of the investigation, it was urged, defense counsel “is not principally concerned with testing, but rather with discovery, whereas at the trial he is serving a wholly different purpose.” United States v. Eggers, supra at 193.
The Court rejected this theory, reasoning that:
“... The proposed analysis of the situation is at the same time too elaborate and sophisticated for practical use, and much too preoccupied with the tactics of advocacy. It is doubtless true — as has been said — that cross-examination is ‘the greatest legal engine ever invented for the discovery of truth.’ At the same time cross-examination is nowhere required, but only the opportunity for its exercise. If in pursuit of some real or fancied strategical advantage of his own, counsel sifts direct examination inadequately at a preliminary stage of the proceedings, he should not be heard to complain when, in a proper case, it confronts him later at the trial. Discovery is not a prime object of the pretrial investigation. At most it is a circumstantial byproduct — and a right unguaranteed to defense counsel.”
Id. at 194.
The court left for future consideration questions involving pretrial testimony less thoroughly sifted than was that involved in Eggers, or where testimony is wholly uncross-examined although the opportunity has been afforded.
The law as stated by the Court of Military Appeals in Eggers remained settled for thirteen years. See United States v. Weaver, 13 U.S.C.M.A. 147, 149, 32 C.M.R. 147,149 (1962); United States v. Cunningham, 12 U.S.C.M.A. 402, 30 C.M.R. 402 (1961); United States v. Tomaszewski, 8 U.S.C.M.A. 266, 24 C.M.R. 76 (1957).
*492 In United States v. Burrow, 16 U.S.C.M.A. 94, 36 C.M.R. 250 (1966), appellant urged the court to overrule its previous decision in Eggers. He also questioned the applicability of Eggers to the facts of his case because there was only minimal cross-examination (1 question) of one of the unavailable witnesses and no cross-examination of the other. Lastly, he argued that admission of the witnesses’ Article 32 testimonies at trial denied him an opportunity to confront them.
Rather than overruling its prior decision in Eggers, the Court extended the holding in Eggers to encompass the factual situation presented by Burrow; the less probing cross-examination or the lack of any cross-examination. In so doing, the court also drew upon the reasoning of the then recent Supreme Court decision in Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), holding that the “opportunity to cross-examine, rather than the exercise thereof, is the critical factor.” United States v. Burrow, supra at 256.
The Eggers-Burrow rule was applied continuously until the adoption of the Military Rules of Evidence, in which the drafters’ analysis again revived the twice-rejected notion of “dissimilar motive.” See United States v. Wheeler, 21 U.S.C.M.A. 468, 45 C.M.R. 242 (1972); United States v. Shaffer, 18 18 U.S.C.M.A. 362, 40 C.M.R. 74 (1969); United States v. Ledbetter, 18 U.S.C.M.A. 67, 39 C.M.R. 67 (1968); United States v. Obligacion, 17 U.S.C.M.A. 36, 37 C.M.R. 300 (1967); United States v. Norris, 16 U.S.C.M.A. 574, 37 C.M.R. 194 (1967); see also United States v. Douglas, 1 M.J. 354 (CMA 1976) citing United States v. Ledbetter, supra and United States v. Obligacion, supra.
D. Application Of Law To The Facts Of The Case At Bar.
In light of the legislative history of Article 32, and over 25 years of judicial precedent, we find the drafters’ analysis to Mil. R.Evid. 804(b)(1) to be of little persuasive value. Indeed, such a compartmentalized approach to the Article 32 hearing may pose a serious risk of subjecting an accused to ill-considered charges, the stigma of unfounded charges, more serious charges, or resolution at a greater forum than warranted due to the failure of counsel to adequately “test” the Government’s case at the pretrial investigation.
We would, therefore, apply the Eggers-Burrow rule to the instant case, since defense counsel had an unlimited opportunity to cross-examine OS3 Schultz. In fact, counsel acting on behalf of appellant did cross-examine OS3 Schultz. The fact that other questions that were not asked could have been asked does not negate the existence of this opportunity or defense counsel’s motive. Although we decline to follow the drafters’ analysis in rendering our decision, we believe that the record adequately establishes that the motive of counsel at the Article 32 investigation was the same as it would have been at trial, that is, to attack the credibility of OS3 Schultz as a witness.
Although the methodology of the defense was not a “classic” cross-examination, the introduction of the witness’ previous statement and the few questions posed to him comported with the principal purpose of cross-examination: to challenge “whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related and whether the declarant’s intended meaning is adequately conveyed by the language he employed.” United States v. Hubbard, 18 M.J. 678, 683 (ACMR 1984), citing Davenport, the Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecution: A Functional Analysis, 85 Harv.L. Rev. 1378 (1972). We, therefore, find that the Article 32 testimony of OS3 Schultz was properly admitted in accordance with Mil.R.Evid. 804(b)(1).
E. Was Appellant Denied The Right To Confront OS3 Schultz?
The confrontation clause of the Sixth Amendment requires a showing that the hearsay declarant is unavailable and *493 that his statement bears adequate indicia of reliability. This reliability may be inferred in a case where the evidence falls within a firmly rooted hearsay exception. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In Ohio v. Roberts, the Supreme Court found no reason to depart from its prior decision in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), which found guarantees of trustworthiness in the accouterments (the oath, right to cross-examination, recorded testimony) of the preliminary hearing itself. Ohio v. Roberts, supra, 448 U.S. at 65, 100 S.Ct. at 2538. Despite the fact that the cross-examination conducted by the defense counsel in the case at bar was not lengthy or comprised of leading questions, it was not such a departure from the normal procedure of the pretrial investigation as to render the testimony produced thereby untrustworthy or unreliable. We, therefore, find that appellant was not denied his right of confrontation.
II
We have examined the evidence produced at trial, as well as the numerous letters requesting clemency. We find that while there is some evidence that appellant has made rudimentary steps toward rebuilding his life, these steps, while encouraging, are grossly overshadowed by the gravity of the offenses committed. We must, like trial counsel, consider the actions of the appellant in their proper context. In doing so, we must also “picture that destroyer (DDG-43), the USS DAHLGREN, transiting [sic] the Suez Canal, in a geographical area that is known for its unrest, a floating weapons platform invariably bustling with missiles and guns, and inside one of the fire control centers the accused and his two co-conspirators running their dope operation, selling mood-altering substances that are well known to be contrary to all regulations and laws to their fellow sailors.” (R. 217).
We, therefore, find the sentence as approved on review below to be manifestly appropriate. Accordingly, the findings and sentence as approved on review below are affirmed.
Judge MITCHELL and Judge BARR concur.

. An 8' X 8' foot compartment containing electronic equipment located on the 0-4 level of the ship.