**UNITED STATES, Appellee,**

v.

**Michael A. ROA, Senior Airman, U.S. Air Force, Appellant.**

No. 53,581.

ACM 24730.

U.S. Court of Military Appeals.

July 27, 1987.

For Appellant: *Luther C. West, Esq.* (argued); *Captain Timothy J. Malloy* (on brief).

For Appellee: *Captain Marc Van Nuys* (argued); *Colonel Kenneth R. Rengert*

and *Lieutenant Colonel Donal F. Hartman, Jr.* (on brief).

*Opinion*

COX, Judge:

After mixed pleas, appellant was convicted by a military judge sitting as a general court-martial of dereliction of duty (three specifications), larceny (three specifications), burglary (two specifications), housebreaking, and false swearing, in violation of Articles 92, 121, 129, 130, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 921, 929, 930, and 934, respectively. His sentence to confinement for 4 years, partial forfeitures, reduction to E-1, and a dishonorable discharge was approved by the convening authority. The Court of Military Review affirmed. 20 M.J. 867 (1985).

We granted review of the following specified issue:

> WHETHER THE EVIDENCE OBTAINED FROM THE SEARCH OF THE ACCUSED'S OFF–BASE STORAGE LOCKER WAS OBTAINED IN VIOLATION OF HIS RIGHT TO COUNSEL.

I hold that the request for consent to search did not violate appellant's right to counsel under the Fifth or Sixth Amendments of the United States Constitution; Article 27, UCMJ, 10 U.S.C. § 827; *United States v. McOmber*, 1 M.J. 380 (C.M.A. 1976); or Mil.R.Evid. 305(e), Manual for Courts-Martial, United States, 1969 (Revised edition).

On March 17, 1984, appellant and Captain Dennis Reimer, both stationed at Davis-Monthan Air Force Base, Arizona, were arrested by Tucson police officers while fleeing the scene of a burglary. Two days later, Agent Freddie L. Myloyde of the Air Force Office of Special Investigations (OSI) called appellant's commander and asked that appellant report to the OSI office. Agent Myloyde planned to question appellant about other burglaries that he was investigating. After being advised of his rights, appellant stated that he wanted to talk with his civilian attorney. No at-

tempt was made to interrogate appellant, but Agent Myloyde asked appellant to return to the OSI office after consulting with his lawyer.

That same morning the Tucson police detective working on appellant's case stopped by the OSI office and briefed Agent Myloyde on his independent investigation. Among other things, he informed Agent Myloyde that he had received a phone call from the manager of Kolb Road Self-Storage, reporting that both appellant and Captain Reimer had rented units at his self-storage facility. The manager recognized their names from a newspaper account of the arrest.

Later that afternoon, Agent Myloyde ascertained that appellant had not returned to the OSI office. He called appellant's commander and asked that appellant again report to the OSI office. Appellant arrived shortly thereafter and was asked if he had talked to his lawyer yet. Appellant replied that he had and that he was "advised ... not to discuss the investigation." Agent Myloyde then asked appellant for consent to search his locker at Kolb Road Self-Storage, his car, and his house. Appellant indicated he would consent but stated that he wanted to talk to his lawyer prior to signing the consent form. Agent Myloyde advised appellant he could refuse to consent, but appellant "still indicated that he would be willing to consent." For 25-to-30 minutes, appellant tried calling his lawyer but was unable to get in touch with him. Appellant then told Agent Myloyde "that he would go ahead and sign the [consent-to-search] form and" inform his lawyer of this later.

The consent-to-search form provided, in part:

> I know that I have an absolute right to give my consent to a search. I understand that, if I do consent to a search, anything found in the search can be used against me in a criminal trial or in any other disciplinary or administrative procedure. I also understand that, if I do not consent, a search cannot be made without a warrant or other authorization recognized in law.

A search of the storage locker revealed a cache of property later determined to be stolen. Appellant subsequently withdrew his consent, so his house and car were not searched on the basis of consent.

The defense made a timely motion at trial to suppress the results of the search, contending that appellant's consent to search was obtained in violation of his right to counsel. The military judge and the Court of Military Review concluded otherwise, however, recognizing the fundamental difference between waiver of the Fourth-Amendment right against unreasonable searches and the Fifth-Amendment right against compelled self-incrimination.

The Fourth Amendment protects one's privacy against unreasonable searches and seizures by the police. A constitutionally valid basis for a reasonable search is consent. Unlike the per se rules applicable to admissibility of a statement obtained in a custodial interrogation, the validity of a consent to search, whether obtained from one in custody or not, hinges on whether the consent was voluntary under the totality of the circumstances. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See* Mil.R.Evid. 314(e). No one factor is dispositive.

A limited Fifth-Amendment right to appointment and presence of counsel at a custodial interrogation has evolved "to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment Rights." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986). Counsel's presence at a custodial interrogation is believed to assure "that statements made in the government-established atmosphere are not the product of compulsion," thereby enhancing "the integrity of the fact-finding processes in court." *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694 (1966). On the other hand, Fourth-

Amendment protections have "nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Schneckloth v. Bustamonte, supra* 412 U.S. at 242, 93 S.Ct. at 2055.

To safeguard the Fifth Amendment's privilege against compelled self-incrimination, the prophylactic rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requires that when an accused invokes his right to have counsel present during custodial interrogation, questioning must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1884–85. *See United States v. Applewhite*, 23 M.J. 196 (C.M.A.1987). However, the privilege against self-incrimination protects only testimonial evidence, not physical evidence. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Lloyd*, 10 M.J. 172 (C.M.A.1981). *See* Mil.R.Evid. 305(d)(1). Neither Article 31, UCMJ, 10 U.S.C. § 831, nor Fifth-Amendment safeguards are infringed by a request for consent to search, as such a request is not interrogation, and the consent thereby given is not a statement. *United States v. Morris*, 1 M.J. 352, 354 (C.M.A.1976); *United States v. Rushing*, 17 U.S.C.M.A. 298, 38 C.M.R. 96 (1967); *United States v. Insani*, 10 U.S.C.M.A. 519, 28 C.M.R. 85 (1959); *United States v. Thompson*, 12 M.J. 993, 996 (A.F.C.M.R.1982); *United States v. Rice*, 3 M.J. 1094, 1102–1103 (N.C.M.R.), pet. denied, 4 M.J. 163 (1977). See United States v. Stoecker, 17 M.J. 158 (C.M.A.1984).

"The fact that consent was given is neutral and has no tendency to show that the accused was guilty of any offense." *United States v. Spivey*, 10 M.J. 7, 10 (C.M.A. 1980) (Everett, C.J., concurring in the result). Consent is not in itself incriminating; it merely provides a legal basis to conduct a search which "obviates recourse by the Government to other alternatives of lawful action that may be open to it." *United States v. Rushing*, 17 U.S.C.M.A. at 303, 38 C.M.R. at 101. *Cf. United States v. Nowl-*

*ing*, 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958) (accused was suspected of pass violation, so policeman should have given Article 31 warnings before asking him to display pass); *United States v. Taylor*, 5 U.S. C.M.A. 178, 17 C.M.R. 178 (1954) (suspect should have been warned under Article 31(b) before being asked to identify his clothing).

Because he was already represented by counsel, a fact well known to investigators, appellant maintains that his consent to search was obtained in violation of his Sixth-Amendment right to counsel. I reject the notion that the Sixth-Amendment right to counsel attaches at the point of interrogation merely because the suspect has retained counsel. The Supreme Court has explicitly addressed this argument, stating:

> [T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the " 'prosecutorial forces of organized society.' " *Maine v. Moulton*, ... [474 U.S. 159]106 S.Ct. [477] at 484 [88 L.Ed.2d 481], (quoting *Kirby v. Illinois*, 406 U.S. [682] at 689 [92 S.Ct. 1877, at 1882, 32 L.Ed.2d 411], ...). By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," *ibid.*, is needed to assure that the prosecutor's case encounters "the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 [104 S.Ct. 2039, 2045, 80 L.Ed.2d 657] ... (1984).

*Moran v. Burbine*, 106 S.Ct. at 1146.

Appellant also contends that the rule in *United States v. McOmber, supra*, was

violated by the investigator's failure to notify counsel when he requested appellant's consent to search. Relying on Article 27, rather than constitutional grounds, we held in *McOmber* that

> [o]nce an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further *questioning* of the accused without affording counsel reasonable opportunity to be present renders any *statement* obtained involuntary under Article 31(d) of the Uniform Code.

1 M.J. at 383 (emphasis added). The purpose of *McOmber* and its progeny is to protect the right to counsel under Article 27 by assuring counsel a reasonable opportunity to be present at any interrogation of the accused. *United States v. Dowell*, 10 M.J. 36, 40 (C.M.A.1980). The notice-to-counsel requirement of *McOmber* has been incorporated into Mil.R.Evid. 305(e). By its terms, *McOmber*, as well as Mil.R.Evid. 305(e), is inapplicable to a request for consent to search, as such a request is not questioning in the sense of "interrogation," and consent obtained is not a "statement" under Article 31. *United States v. Rushing, United States v. Insani,* and *United States v. Rice,* all *supra. See United States v. Stoecker,* 17 M.J. at 161–62.

"Consent to a search, like consent to the taking of a sample of blood or fingerprints, is not subject to manipulative conditions which endanger or derogate from the accused's right to a fair trial." *United States v. Rushing,* 17 U.S.C.M.A. at 303, 38

C.M.R. at 101. Thus, there is no compelling need to create yet another prophylactic rule by expanding *McOmber* to require that counsel be given an opportunity to monitor search requests. I am not persuaded that this is necessary to assure effective legal representation or to promote the truth-finding process. Whether consent to search was freely and voluntarily given can properly "be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra* 412 U.S. at 227, 93 S.Ct. at 2047. *See United States v. Wallace,* 11 M.J. 445 (C.M.A. 1981).

If the investigators had refused appellant the opportunity to contact his counsel or neglected to advise him that he could refuse to consent to the search, that would weigh heavily against a determination that the consent was voluntary. It is undisputed, however, that appellant was given the opportunity to contact his lawyer. When he was unable to reach him, appellant did not request a postponement until he could consult with his lawyer. Instead, *he* suggested proceeding with the search and informing his lawyer later. It is also clear that appellant was aware that he did not have to consent to the search and that anything discovered thereby could be used against him. The determination by the military judge that appellant voluntarily consented to the search of his storage locker is fully supported by the evidence.[*]

---

[*] Although I agree with Chief Judge Everett's concern regarding use of a communication to establish a proprietary interest in the item searched, that is not a problem here. Certainly, it was not viewed as such by defense counsel, who did not object on that basis at trial. Furthermore, as appellant's "communication" was not introduced into evidence on the merits, it does not appear that it was used by the factfinder in determining guilt.

I disagree with Judge Sullivan that the concept of inevitable discovery under *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is applicable under the facts of this case. The police detective testified that there was no move underway to obtain a search warrant at the time consent to search appellant's locker was requested, as they had no prob-

able cause. The day after the consent search, a warrant was obtained to search the locker. The detective testified, however, that absent the information obtained from the consent search of the locker, they would not have had probable cause to obtain a search warrant at that time. Neither the military judge nor the Court of Military Review made any findings regarding inevitable discovery. Thus, I am not convinced that the evidence in the locker would have ultimately and inevitably been discovered by lawful means absent the consent search. *Cf. United States v. Silvestri,* 787 F.2d. 736 (1st Cir.1986); *United States v. Cherry,* 759 F.2d 1196 (5th Cir. 1985); *United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985).

The decision of the United States Air Force Court of Military Review is affirmed.

EVERETT, Chief Judge (concurring in the result):

The lead opinion points out that *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), is intended to protect the privilege against self-incrimination guaranteed by the Fifth Amendment. Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, has a similar purpose. *United States v. Howard*, 5 U.S.C.M.A. 186, 17 C.M.R. 186 (1954); *United States v. Eggers*, 3 U.S.C.M.A. 191, 11 C.M.R. 191 (1953). Their concern is with interrogation, rather than with unreasonable searches and seizures.

*United States v. McOmber*, 1 M.J. 380, 382 (C.M.A.1976), established requirements to which military investigators are subject "when they wish to *question* the suspect." (Emphasis added.) Likewise, Mil.R.Evid. 305(e) calls for notice to counsel if investigators intend "to question" a suspect. In this context, questioning is far different from requesting consent to a search.

Indeed, interrogation is for the purpose of eliciting from a suspect communications about the matter under investigation. However, a consent to search does not of itself communicate any information about the investigated crime; and it is not a statement regarding an offense, *see* Art. 31(b). Therefore, requesting consent to search property in which a suspect has an interest is not prohibited by his prior request for counsel, because *Edwards* provides protection only as to interrogation. Denial of a suspect's request for counsel, along with other circumstances, is to be considered in determining whether his consent was given voluntarily, but it is not a decisive fact. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, the request for counsel did not preclude the military judge from ruling that Roa's consent to search his locker was voluntary.

A distinction must be made, however, between granting consent to search property which already has been identified by law-enforcement agents and identifying property for those agents. Thus, in *United States v. Taylor*, 5 U.S.C.M.A. 178, 17 C.M.R. 178 (1954), this Court ruled that Article 31(b) had been violated when, in response to a request that he point out his clothing, the suspect identified an overcoat in which two marijuana cigarettes were found.

The Supreme Court has recognized that authentication or identification of documents may constitute a testimonial utterance. *Cf. United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). As observed by the Court in *Fisher:*

> The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena.

*Id.* at 410, 96 S.Ct. at 1580. Therefore, *Edwards* precludes an investigator from asking a suspect to communicate any information as to the location of his property after he has made a request for counsel.

According to the testimony of Dennis J. Morgan, a detective with the Tucson, Arizona, Police Department, the police had received a phone call from Mr. Riesing, the manager of a local self-storage facility, who "had read in the paper of the arrest involving the Air Force personnel. He advised that he recognized both names as customers of his who had storage facilities at his business." Morgan furnished this information to OSI Agent Myloyde, who was participating in the investigation of several burglaries of which Roa was suspected.

Myloyde then asked appellant "if he would sign a consent to search form for his residence, for his storage facility", and for his vehicle. Ultimately Roa executed this

form; and the three men proceeded to the self-storage facility, where they met Riesing. "We went to the facility that *Airman Roa advised us was his storage facility.* Airman Roa took a key and unlocked the lock and opened the door." (Emphasis added.)

In my view, when Roa "advised" the two investigators which locker was his, *Edwards* was violated. *Cf. United States v. Applewhite,* 23 M.J. 196 (C.M.A.1987). This violation of Roa's Fifth-Amendment rights did not vitiate the consent to search which he had already given. However, it precluded use of any tacit or express communication by appellant to link him to the locker in which ultimately the contraband was found.

Although it appears to me that appellant's communication was used by the factfinder to establish his proprietary interest in the locker where the stolen property was found, I conclude that this error was not prejudicial. Riesing, the manager of the self-storage facility, had originally informed the police that Roa and a confederate, Captain Reimer, each had a locker there. Riesing was present when the two investigators brought appellant to the facility; and he possessed the contracts which Roa and Reimer had signed for their respective lockers. Each of these contracts was shown to the investigators before they left the facility; and each contained the name of the renter and the number of his locker.

If Roa had not identified his locker, its location could have been determined by the investigators quite readily. They could simply have checked the number on the lease signed by Roa. Under the circumstances, I would apply a variant of the doctrine of inevitable discovery. *Cf. Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *United States v. Kozak,* 12 M.J. 389 (C.M.A.1982). Even if investigators initially determined the location of Roa's locker in an impermissible manner—namely, by asking him—and even if this identification was part of the government evidence at trial, appellant was not prejudiced. His lease, the contents of which were available to the investigators at the time and later were available to the court-martial, provided all the information necessary to determine which was Roa's locker.

Furthermore, at trial, the defense did not raise any objection that, since he had identified a particular locker, Roa's privilege against self-incrimination was violated. If a specific objection had been made concerning admissibility of the locker identification, the Government could readily have presented other evidence to establish which locker had been rented by appellant.

Even though here we have a basis for affirming, this case demonstrates the problems that may arise if, despite a request for counsel, an investigator asks a suspect for consent to search his property. In the first place, the absence of counsel may tend to make the voluntariness of the consent more questionable. Even more importantly, it may be difficult to obtain consent without eliciting some incriminating admissions—especially in the form of authentication or identification of evidence. Thus, after a request for counsel, the safest course is for the investigator to deal with the suspect's attorney, rather than to rely on the distinction between consent and communication.

SULLIVAN, Judge (concurring in the result):

The only aspect of this case that troubles me is the questioning of appellant while in custody. In my view, all questioning should have ceased since appellant was in custody, had secured counsel, and had unequivocally asserted his rights under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. Cf. *Connecticut v. Barrett,* — U.S. ——, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). After informing the OSI investigators that he had counsel and that counsel had instructed "him not to discuss the investigation" with the OSI, appellant was further asked for consent to search his off-base rented storage locker. This was one question too many. *See generally Ari-*

*zona v. Mauro*, —— U.S. ——, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). Asking appellant's consent to search was a violation of the bright-line rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Therefore, normally it would be error to admit any evidence found as a result of such a violation. *See generally Colorado v. Spring*, —— U.S. ——, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987); *Nix v. Williams*, 467 U.S. 431, 442, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). *Cf. Michigan v. Tucker*, 417 U.S. 433, 445–47, 94 S.Ct. 2357, 2364–65, 41 L.Ed.2d 182 (1974).

However, the exclusionary rule does not require suppression of the evidence found in appellant's storage locker. *See generally United States v. Kozak*, 12 M.J. 389 (C.M.A.1982). The record is clear that law-enforcement officials employing proper procedures would have inevitably discovered all relevant evidence in this locker even if appellant had refused to consent to the search. At the time the OSI asked appellant for his consent, the Tucson police and the OSI both knew:

1. There was a string of similar but unsolved burglaries involving the theft of many items prior to March 17, 1984.

2. On March 17, 1984, appellant and Captain Reimer were arrested in the process of committing a burglary off-base.

3. Appellant had confessed to the Tucson police about his participation with Captain Reimer in committing that burglary as well as a number of other burglaries in the Tucson area.

4. The owner of the rental storage locker warehouse, after reading a newspaper account of appellant's and Captain Reimer's participation in the March 17 burglary, informed the police that *both* appellant and Reimer had rented storage lockers in his warehouse.

5. The types of items taken in the burglaries were items that could be concealed in a rental storage locker.

With this knowledge, the Tucson police could,* and in my view should, have obtained a warrant from a local judge authorizing a search of appellant's rental storage locker. Thus, even without appellant's consent, the police, using proper procedures, would have inevitably discovered the items in the locker. As the Supreme Court said in *Nix v. Williams*, 467 U.S. at 444, 104 S.Ct. at 2509:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means...then the deterrence rationale has so little basis that the evidence should be received.

(Footnote omitted.) In the instant case, the doctrine of inevitable discovery removes any taint to the evidence obtained as a result of the improper questioning of appellant. These words of the Supreme Court in *Nix* are especially applicable here: "The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Id.* at 443 n. 4, 104 S.Ct. at 2509 n. 4.

I join in affirming appellant's conviction.

* The police officer's opinion to the contrary (R. 217) is not controlling. *See Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion).