UNITED STATES, Appellee,

v.

Lyman A. CONNOR, Fire Control Technician (Guns) Seaman Apprentice, U.S. Navy, Appellant.

No. 51,351.
NMCM 84 1585.

U.S. Court of Military Appeals.

Feb. 16, 1989.

*mander J. A. Williams*, JAGC, USN (on brief); *Captain David C. Larson*, JAGC, USN and *Lieutenant Marva J. Daniel*, JAGC, USNR.

For Appellee: *Captain Thomas D. Miller*, USMC (argued); *Captain Wendell A. Kjos*, JAGC, USN (on brief); *Captain W. J. Hughes*, JAGC, USN and *Lieutenant Commander Jeffrey S. Sawtelle*, JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was charged with various drug offenses committed aboard the USS DAHLGREN. On mixed pleas, he was convicted by a military judge sitting alone as a general court-martial of conspiring with two other sailors to distribute hashish, in violation of Article 81 of the Uniform Code of Military Justice, 10 USC § 881, and of wrongful possession of hashish with intent to distribute and seven distribution offenses, in violation of Article 134, UCMJ, 10 USC § 934.[1] The military judge sentenced Connor to a dishonorable discharge, confinement for 4 years, total forfeitures, and reduction to pay grade E-1. The convening authority reduced the confinement by one month and suspended for a year so much of the sentence as provided for confinement in excess of 3 years and a discharge more severe than a bad-conduct discharge, with provision for automatic remission.

The Court of Military Review affirmed the findings and sentence, 19 MJ 631

For Appellant: *Lieutenant Deborah D. Sorkin*, JAGC, USNR (argued); *Com-*

1. Connor was charged with conspiring with Bruce W. Johnson and Daniel L. Miltenberger to distribute hashish on board the USS DAHLGREN and with acting with Johnson to effectuate the conspiracy by buying hashish in Naples, Italy, introducing it on the vessel, offering to sell the hashish, and selling it. Connor pleaded guilty to so much of this charge as alleged that he conspired to possess hashish and bought it; but he pleaded not guilty to the other allegations under this charge. During the providence inquiry, he testified that he, Johnson, and Miltenberger had pooled their money, bought hashish in Naples, and split it before returning to the vessel. He was convicted as charged.

Charge II contained twelve specifications. Specification 1, of which Connor was acquitted, alleged wrongful introduction of at least 28.87 grams of hashish aboard the USS DAHLGREN with intent to distribute. Specifications 2–4, of which he also was acquitted, alleged that he had wrongfully induced Michael Luthman, Mark Schultz, and Stephen Kearns wrongfully to possess hashish aboard the vessel by offering to sell it to them.

Specifications 5–10 and 12 alleged that Connor had wrongfully distributed hashish to various sailors. He pleaded guilty to one distribution and not guilty to the other six; but the court-martial found him guilty in every instance. In addition, he was convicted of the wrongful possession, to which he also pleaded not guilty.

(1984); and we granted review to determine admissibility at Connor's trial of former testimony given at the pretrial hearing conducted pursuant to Article 32 of the Code.[2]

I

At trial, Chief Master–at–Arms Whalen testified for the Government that, as a result of a conversation with Petty Officer Mark Schultz, he had instructed Schultz to make a "controlled buy" of drugs from Connor and Bruce Johnson. He also had given Schultz three $10 bills whose serial numbers had been recorded; and he had instructed Schultz to notify him if a buy could be made. About an hour later, Schultz telephoned Whalen; and thereafter Whalen and two other chiefs went to the barbette—a large compartment on the ship where electronic equipment was located. Connor, Johnson, and Schultz were inside the barbette; and Whalen informed them that they were suspected of selling hashish, advised them of their rights, and then made a "pat-down search" of each man. A half gram of hashish was found on Schultz; and the three marked $10 bills were part of the cash found in Connor's possession.

Whalen had not searched Schultz before the buy was made. He was not aware that Schultz owed Connor $80; but he did not think that Schultz could have used the three $10 bills to pay the debt. Whalen believed Schultz was reliable, even though he was pending nonjudicial punishment for a 6–hour unauthorized absence and even though he was absent without authority at the time of Connor's trial.

The Government then offered in evidence the testimony that had been given by Mark Schultz during the Article 32 hearing. This had been a joint hearing in which Connor and his two alleged co-conspirators—Johnson and Miltenberger—had each been represented by counsel. After first identifying himself and the accused, Schultz had identified a sworn statement that he had made on May 27, 1983, to Special Agent King of the Naval Investigative Service (NIS). Schultz asserted that this statement had been correct when he made it; and, without objection from any of the defense counsel, he adopted it as his testimony.

Then, in answer to questions from the government counsel, Schultz reaffirmed the portion of this statement which referred to "reaching into a bag and getting a piece of hashish"; and he testified that this piece of hashish, which was "wrapped in foil," was like other pieces in the bag.

The investigating officer then was informed by counsel that the "primary defense counsel"—in this instance, Lieutenant Hodges, who represented Miltenberger—would cross-examine Schultz, after which the two other defense counsel would have an opportunity to pose questions.[3] Lieutenant Hodges then elicited from Schultz the testimony that, on April 30, the day after his apprehension, he had given a handwritten statement to a chief petty officer on the USS DAHLGREN. Schultz affirmed that this statement was accurate and, without government objection, adopted it as his testimony.

This earlier statement differed from Connor's statement of May 27 to NIS in three important ways: First, as was brought out by cross-examination of Schultz at the Article 32 hearing, it did not mention that

2. *See* 10 USC § 832. The issue granted was stated in these terms:

WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE FORMER TESTIMONY OF OS3 MARK EDWARD SCHULTZ GIVEN AT THE ARTICLE 32 HEARING, IN THAT IT WAS INADMISSIBLE HEARSAY, ADMISSION OF WHICH DENIED APPELLANT HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION.

3. This arrangement appears in prosecution exhibit 14 with a black line marked through it. The record of trial suggests that this portion was "redacted" by counsel before the exhibit was offered to the judge. Nevertheless, we will take notice of it as it is part of the pretrial investigation record, and it only relates to a procedural matter. We note that this information was not "redacted" from prosecution exhibit 1 for identification, but that exhibit was not admitted in evidence. (R. 91, 94).

Schultz had gone to the barbette and spoken with Connor and his two alleged coconspirators before calling Chief Whalen to announce that a drug buy was imminent. Second, there were some discrepancies between the two statements about the times when certain events occurred. Finally, the earlier statement had indicated that, in return for his participation in the controlled buy, Schultz had received some assurance of less onerous nonjudicial punishment at a pending captain's mast.

Schultz was excused as a witness; but shortly thereafter he was recalled by defense counsel, who examined him further about how much time had passed during the "controlled buy." The government counsel then asked him about his movements while this transaction was going on.

When the Government offered Schultz' Article 32 testimony at appellant's trial, Schultz was absent without leave; and the defense made no contention that he was available to testify. However, defense counsel did object that, at the pretrial hearing, the defense had no reason to impeach Schultz. Moreover, "the investigation was not yet completed and a number of things were being sent around the world that the defense had not had a chance to look at." Finally, the defense contended that, even if Schultz' former testimony at the Article 32 investigation was admissible, the two prior statements which he had adopted in his testimony should be excluded and the only evidence received should be the answers which he had given before the investigating officer.

The military judge overruled the defense objection and admitted Schultz' former testimony—including his statements of April 30 and May 27, which he had adopted at the time of the Article 32 hearing.

After the former testimony had been received, the Government offered in evidence the marked currency that had been used in Schultz' purchase of the hashish. Then several of the sailors who had purchased hashish from Connor testified under grants of immunity. Finally, there was admitted in evidence an NIS lab report which identified as hashish the foil-wrapped substance found by Chief Whalen in Schultz' pocket on April 29, 1983.

## II

### A

The testimony of Mark Schultz was admitted at appellant's trial pursuant to the "former testimony" exception to the hearsay rule and to the right of confrontation. The leading case on this exception is *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), which held admissible a transcribed copy of the court reporter's stenographic notes of testimony given by two government witnesses during a former trial of an indictment for murder. Both witnesses had died; and, in view of their unavailability, the Supreme Court ruled that reception of their former testimony had not violated the defendant's right of confrontation. According to the Court, "[T]he authority in favor of the admissibility of such testimony, where the defendant was present either at the examination of the deceased witness before a committing magistrate, or upon a former trial of the same case, is overwhelming." *Id.* at 241, 15 S.Ct. at 339.

The Court explained:

The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of, and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes and of the testimony of the deceased witness, such as was produced

in this case, is competent evidence of what he said.

*Id.* at 244, 15 S.Ct. at 340.

The Court also ruled that the trial court had not erred in refusing to admit evidence offered by the defense that, after the former trial, one of the deceased witnesses had made statements contradicting his former testimony and stating "that all that he had testified to on the former trial was false." *Id.* at 245, 15 S.Ct. at 340. In this connection, the Court took the view that a witness can be impeached by inconsistent statements only if a foundation has been laid by asking the witness

> whether he has ever made such statements. Justice to the witness himself requires, not only that he should be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced.

*Id.* at 245–46, 15 S.Ct. at 341. With respect to the former testimony, this impeachment was impossible because the inconsistent statements were made after the testimony had been given. However, this circumstance did not change the rule. According to the Court:

> While the enforcement of the rule, in case of the death of the witness subsequent to his examination, may work an occasional hardship by depriving the party of the opportunity of proving the contradictory statements, a relaxation of the rule in such cases would offer a temptation to perjury, and the fabrication of testimony, which, in criminal cases especially, would be almost irresistible.

*Id.* at 250, 15 S.Ct. at 342.

In *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900), the Supreme Court considered admissibility of testimony of a witness taken in a preliminary examination before a United States commissioner. The Court concluded that the former testimony had been admitted in violation of the defendant's right of confrontation, because the absence of the witness was due to the negligence of the prosecution. However, the Court did not intimate that former testimony taken during a preliminary examination would be treated differently from that which was received at a former trial.

More recently, the Supreme Court dealt with the former-testimony exception in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). There a witness had testified at a preliminary hearing and had been examined extensively by defense counsel. Subsequently, the witness did not appear at defendant's trial, and her former testimony was received in evidence. A majority of the Court ruled that she had been unavailable as a witness and that admission of her former testimony did not violate the defendant's right of confrontation.

In view of these precedents, it appears clear that, insofar as the Sixth Amendment is concerned, former testimony may be received in evidence against a defendant if the witness is deceased or otherwise "unavailable," whether the testimony was given at a former trial of the same case or at a preliminary examination. In *Mattox* and in *Roberts*, the absent witnesses had been examined extensively at the preliminary hearing, but the Supreme Court did not state specifically that former testimony is inadmissible unless it has been subjected to extensive cross-examination. Moreover, in *Mattox* the former testimony came in even though the defense had no opportunity to cross-examine the witness about subsequent statements inconsistent with that testimony.

## B

The Uniform Code of Military Justice provides explicitly for admissibility of former testimony in one situation. Article 50(a), 10 USC § 850(a), which concerns courts of inquiry, states:

> In any case not capital and not extending to the dismissal of a commissioned

officer, the sworn testimony, contained in the duly authenticated record of proceedings of a court of inquiry, of a person whose oral testimony cannot be obtained, may, if otherwise admissible under the rules of evidence, be read in evidence by any party before a court-martial or military commission if the accused was a party before the court of inquiry and if the same issue was involved or if the accused consents to the introduction of such evidence.

Also, in Article 49 of the Code, 10 USC § 849, authorization is given to take oral or written depositions after charges have been preferred; and, subject to conditions prescribed in Article 49(d), a deposition "may be read in evidence before any military court or commission in any case not capital, or in any proceeding before a court of inquiry or military board." It is clear that this Article contemplates use of depositions by the Government as well as by the defense.

Of course, it should be recalled that, when the Uniform Code was enacted, the Supreme Court had never specifically ruled that servicemembers were entitled to the protections of the Bill of Rights.[4] Thus, Congress had no occasion to consider whether use against an accused of former testimony or of depositions violated the Sixth–Amendment right of confrontation.

Paragraph 145b, Manual for Courts-Martial, United States, 1951, made specific provision for admission of "former testimony"—as well as depositions. According to that provision:

When at any trial by court-martial including a rehearing or new trial, it appears that a witness who has testified in either a civil or military court at a former trial of the accused in which the issues were substantially the same (except a former trial shown by the objecting party to be void because of lack of jurisdiction), is dead, insane, too ill or infirm to attend the trial, beyond the reach of process, more than one hundred miles from the place where the trial is held, or cannot be found, his testimony in the former trial, if properly proved, may be received by the court if otherwise admissible, except that the prosecution may not introduce such former testimony of a witness unless the accused was confronted with the witness and afforded the right of cross-examination at the former trial, and unless, in a capital case, the witness is dead, insane, or beyond the reach of process.[5]

In *United States v. Eggers,* 3 USCMA 191, 11 CMR 191 (1953), this Court considered whether testimony recorded at a pretrial investigation under Article 32 had been properly admitted into evidence. The Court noted that if the testimony of the absent witness had been given "at a previous *court-martial hearing* of charges against the accused," it would clearly be admissible.

Instead, the offered record of her testimony was made during a pretrial investigation of the very charges under which the accused was tried in the case at bar. Should the presence of this difference produce another result? We think not. *Id.* at 193, 11 CMR at 193. Relying on Dean Wigmore and on common law principles, the Court concluded that omission from the Code and Manual of any specific reference to the use of former testimony given during a pretrial investigation did not preclude reception of this evidence.

Judge Brosman, writing for a unanimous Court, emphasized that the testimony at the pretrial investigation was trustworthy, because it "was cross-examined, searchingly and at length, by the very party-opponent against whom it is now offered; and—

---

4. For an interesting debate as to whether the Founding Fathers intended to grant such protection, *see* Henderson, *Courts–Martial and the Constitution: The Original Understanding,* 71 Harv.L.Rev. 293 (1957); and Wiener, *Courts–Martial and the Bill of Rights: The Original Practice II,* 72 Harv.L.Rev. 266 (1958).

5. The conditions for admissibility in non-capital cases are the same conditions prescribed by Article 49(d), UCMJ, 10 USC § 849(d), for admission of depositions in non-capital cases.

despite the promptings of appellate defense counsel—it certainly dealt with the very issues involved in the case at bar, that is, with the general question of whether accused forged and uttered the documents with which the present case is concerned." *Id.* at 193, 11 CMR at 193.

Judge Brosman also pointed out that it has been urged on us that, in terms of realism, the challenged testimony was not in point of fact cross-examined by one with an interest and motive identical with that of the accused at the trial—and this despite his presence on both occasions. The notion here seems to be, of course, that the tactical objectives of a cross-examining defense counsel at the pretrial investigation are likely to be quite different from those of the same counsel at the court-martial hearing. At the stage of investigation, it is said, he is not principally concerned with testing, but rather with discovery, whereas at the trial he is serving a wholly different purpose. The result of all this—the argument continues—is that, were we to condone the reception of the record offered here, we would be placing our stamp of approval on the admission—and in the face of objection—of a mere sworn statement inadequately tested by cross-examination.

There is, indeed, something to be said for the argument—but not enough, we believe. In the first place, we do not think that the difference between the attitudes of defense counsel on these two occasions is as great as has been supposed. Moreover, the proposed analysis of the situation is at the same time too elaborate and sophisticated for practical use, and much too preoccupied with the tactics of advocacy. It is doubtless true—as has been said—that cross-examination is "the greatest legal engine ever invented for the discovery of truth." At the same time cross-examination is nowhere *required*, but only the *opportunity* for its exercise. If, in pursuit of some

real or fancied strategical advantage of his own, counsel sifts direct examination inadequately at a preliminary stage of the proceedings, he should not be heard to complain when, in a proper case, it confronts him later at the trial. Discovery is not a prime object of the pretrial investigation. At most it is a circumstantial by-product—and a right unguaranteed to defense counsel.

[E]xclusion will often result in a failure of proof and in unrequited crime. And admission we believe is wholly safe—fully as safe, we are sure, as is reception under numerous hearsay exceptions in which cross-examination plays no part at all.

*Id.* at 193–94, 11 CMR at 193–94 (footnote omitted).

The Court left "for future consideration questions involving pretrial testimony less thoroughly sifted than was that involved there—or wholly uncross-examined, although an opportunity for such testing has been afforded." Also, the Court's opinion in *Eggers* did not inquire whether the accused had any constitutional right of confrontation and, if so, whether it had been violated.[6]

However, the Court observed "that the pretrial investigation in military practice may properly be identified with the preliminary hearing of criminal law administration in the civilian scene" and set out several "authorities from the latter areas [which] support fully the law officer's ruling in the case at bar"—citing *Mattox v. United States* and *Motes v. United States*, both *supra;* and four lower Federal court cases. *Id.* at 194, 11 CMR at 194.

In *United States v. Sutton*, 3 USCMA 220, 11 CMR 220 (1953)—which was decided two weeks after *Eggers*—this Court held that a deposition taken on written interrogatories may be admitted into evidence pursuant to Article 49 of the Code, even if the accused had not been present when the deposition was taken. The principal opinion, written by Judge Latimer, and

---

**6.** As has already been noted, n.3, *supra,* the Supreme Court had not yet specifically held that

a servicemember is protected by the Bill of Rights.

the concurring opinion by Judge Brosman do not make clear whether in their view the servicemember enjoyed any constitutional right of confrontation.

On the other hand, Chief Judge Quinn, in a vigorous dissent, asserted:

I have absolutely no doubt in my mind that accused persons in the military service of the Nation are entitled to the rights and privileges secured to all under the Constitution of the United States, unless excluded directly or by necessary implication, by the provisions of the Constitution itself.

In his view, the majority opinion "lightly deprives the accused in this case of a basic constitutional privilege." 3 USCMA at 228, 11 CMR at 228.

By 1960, a majority of the Court had come around to Chief Judge Quinn's view. In *United States v. Jacoby*, 11 USCMA 428, 29 CMR 244 (1960), this Court ruled, over Judge Latimer's dissent, that a deposition taken on written interrogatories is not admissible unless the accused and his counsel were provided an opportunity to be present and question the witness. Judge Ferguson, writing for the Court, asserted that "it is apparent that the protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces. Moreover, it is equally clear that the Sixth Amendment guarantees the accused the right personally to confront the witnesses against him." *Id.* at 430–31, 29 CMR at 246–47. The opinion quotes extensively from *Mattox* and *Motes*.

In *United States v. Burrow*, 16 USCMA 94, 36 CMA 250 (1966), this Court was asked to overrule its *Eggers* decision. Appellate defense counsel did not "contend verbatim testimony from a previous trial of the same accused should be excluded," but "they question[ed] the current applicability of the authorities upon which this Court relied in reaching its decision as to Article 32 testimony, particularly in light of the recent decision by the United States Supreme Court in *Pointer v. Texas*, 380 U.S.

400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)." 16 USCMA at 96, 36 CMR at 252. This Court refused to overrule *Eggers* and noted that the opinion in *Pointer v. Texas, supra* —which held that a defendant's Sixth-Amendment right of confrontation was applicable to the states under the due-process clause of the Fourteenth Amendment—had "cited, in support of its decision, the same authorities upon which we relied in *Eggers*." 16 USCMA at 97, 36 CMR at 253.

The Manual for Courts-Martial, United States, 1969 (Revised edition), followed its 1951 predecessor in authorizing admission of former "testimony of a witness given in a civil or military court at a former trial of the accused in which the issues were substantially the same ..." Para. 145*b*. Moreover, in reliance on *Eggers* and *Burrow*, this Manual contained an express provision that "[f]ormer testimony given at a preliminary judicial hearing, such as an investigation conducted under Article 32, of an allegation against the accused is admissible under the same conditions as testimony given at a former trial of the accused." Also, paragraph 145*b* contains several other references to "preliminary judicial hearing"—references which were lacking in the 1951 Manual.

C

When the Federal Rules of Evidence took effect in 1975, Fed.R.Evid. 804(b)(1) provided that, "if the declarant [was] unavailable as a witness," the hearsay rule would not exclude his former

[t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Unlike the 1951 and 1969 Manuals for Courts–Martial, Fed.R.Evid. 804(b)(1) did not require that the issues at trial be the

same or "substantially the same" as those at the proceeding where the former testimony had been given. Instead, it focused on similarity of motive to develop the testimony. The rationale for this change was:

> Since identity of issues is significant only in that it bears on motive and interest in developing fully the testimony of the witness, expressing the manner in the latter terms is preferable.

Notes of Advisory Committee on Proposed Rules.

When the Military Rules of Evidence were promulgated by the President in 1980, the treatment of former testimony paralleled that of the Federal Rules. Mil.R. Evid. 804(b)(1) defines *"[f]ormer testimony"* as

> [t]estimony given as a witness at another hearing of the same or different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. A record of testimony given before courts-martial, courts of inquiry, military commissions, other military tribunals, and before proceedings pursuant to or equivalent to those required by Article 32 is admissible under this subdivision if such a record is a verbatim record. This paragraph is subject to the limitations set forth in Articles 49 and 50.

The Drafters' Analysis of Mil.R.Evid. 804(b)(1) notes that it was "taken from the Federal Rule with omission of the language relating to civil cases. The second portion is new and has been included to clarify the extent to which those military tribunals in which a verbatim record normally is not kept come within the Rule." According to the Analysis, the Committee which drafted the Military Rules "believe[s] substantive use of former testimony to be too important to be presented in the form of an incomplete statement."

The Analysis then offers this discussion of the "special problem" presented by investigations under Article 32:

> Rule 804(b)(1) requires that "the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony" at the first hearing. The "similar motive" requirement was intended primarily to ensure sufficient identity of issues between the two proceedings and thus to ensure an adequate interest in examination of the witness. *See, e.g.,* 4 J. Weinstein & M. Berger, Weinstein's Evidence, para. 804(b)(1) [ (04) ] (1978). Because Article 32 hearings represent a unique hybrid of preliminary hearings and grand juries with features dissimilar to both, it was particularly difficult for the Committee to determine exactly how subdivision (b)(1) of the Federal Rule would apply to Article 32 hearings. The specific difficulty stems from the fact that Article 32 hearings were intended by Congress to function as discovery devices for the defense as well as to recommend an appropriate disposition of charges to the convening authority. *Hutson v. United States,* 19 [U.S.] C.M.A. 437, 42 C.M.R. 39 (1970); *United States v. Samuels,* 10 [U.S.] C.M.A. 206, 212, 27 C.M.R. 280, 286 (1959). *See generally* Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services, 81st Cong., 1st Sess. 997 (1949). It is thus permissible, for example, for a defense counsel to limit cross-examination of an adverse witness at an Article 32 hearing using the opportunity for discovery, alone, for example, rather than impeachment. In such a case, the defense would not have the requisite "similar motive" found with Rule 804(b)(1).

> Notwithstanding the inherent difficulty of determining the defense counsel's motive at an Article 32 hearing, the Rule is explicitly intended to prohibit use of testimony given at an Article 32 hearing unless the requisite "similar motive" was present during that hearing. It is clear that some Article 32 testimony is admissible under the Rule notwithstanding the

Congressionally sanctioned discovery purpose of the Article 32 hearing. Consequently, one is left with the question of the extent to which the Rule actually does apply to Article 32 testimony. The only apparent practical solution to what is otherwise an irresolvable dilemma is to read the Rule as permitting only Article 32 testimony preserved via a verbatim record that is not objected to as having been obtained without the requisite "similar motive." While defense counsel's assertion of his or her intent in not examining one or more witnesses or in not fully examining a specific witness is not binding upon the military judge, clearly the burden of establishing admissibility under the Rule is on the prosecution and the burden so placed may be impossible to meet should the defense counsel adequately raise the issue. As a matter of good trial practice, a defense counsel who is limiting cross-examination at the Article 32 hearing because of discovery should announce that intent sometime during the Article 32 hearing so that the announcement may provide early notice to all concerned and hopefully avoid the necessity for counsel to testify at the later trial.

1969 Manual, *supra* at A18–109 to A18–110 (Ch. 3); *see* Manual for Courts–Martial, United States, 1984, at A22–46; at A22–51 (Ch. 2).

In *United States v. Arruza*, 26 MJ 234 (CMA 1988), the Court recently considered whether the military judge had erred in admitting, over defense objection, testimony that had been given at a pretrial investigation by a 6–year–old child to the effect that she had been sexually molested by the accused. "[T]he military judge [had] entered special findings that defense counsel's cross-examination at the Article 32 hearing had a two-fold purpose: impeachment and discovery." *Id.* at 235–36. In upholding the judge's reception of the former testimony, we pointed out:

This Court has long held that "[d]iscovery is not a prime object of the pretrial investigation." United States v. Eggers, 3 USCMA 191, 194, 11 CMR 191, 194 (1953). Furthermore, regardless of defense counsel's assertions, the opportunity to cross-examine the witness was available to and used by him.

The "substantially verbatim" record of the child's Article 32 testimony, given under oath, was properly admitted into evidence against appellant and satisfies both the requirements of Mil.R.Evid. 804(b)(1) and the confrontation clause of the Sixth Amendment.

26 MJ at 236.

## III

### A

■ In the present case, Connor's defense counsel contended that, at the time of the Article 32 investigation, he and counsel for his co-accused simply were obtaining discovery of the Government's evidence and were not seeking to impeach Schultz or the other witnesses. The military judge—undoubtedly having in mind the Drafters' Analysis to Mil.R.Evid. 804(b)(1)—observed that, at the time of the pretrial hearing, defense counsel had not announced that they were interested only in discovery, and he commented:

I'm not saying the law requires it, but everything I have read and comments concerning prior testimony at Article 32s suggests that counsel make it well known to everybody that we are simply exercising our discovery rights and want to know what the Government has, but not in any way attempting to cross-examine these people.

\* \* \* \* \* \*

Again, I don't feel that that's an absolute requirement, but it's certainly the sort of thing that would help clarify a situation such as this.

From the colloquy that followed at trial, it is unclear to us whether the military judge accepted the position in the Drafters' Analysis that, if the defense was interested only in discovery and not in impeachment, the former testimony would not be admissible. Moreover, unlike the judge in *Arruza*,

the military judge made no special findings as to the purpose of the defense's cross-examination at the Article 32 hearing. In its opinion, however, the Court of Military Review entirely rejected the dichotomy proposed by the Drafters' Analysis, a dichotomy which is based primarily on the words "similar motive" in Mil.R.Evid. 804(b)(1).

We also reject this dichotomy. In the first place, it does not accord with precedents in military law and was specifically rejected by the Court in *Eggers.* Second, we think the distinction is unworkable in practice. Even if a defense counsel states at the beginning of an Article 32 hearing that he only wishes to obtain discovery of government evidence, he may later cross-examine about matters which tend to impeach the witness. Indeed, in conducting pretrial discovery, a lawyer often seeks to "discover" evidence which may be useful later for "impeachment."

The difficulty of applying the distinction is illustrated by this very case. At the pretrial hearing, defense counsel had Schultz adopt as his testimony his statement of April 30; and this statement was not completely consistent with his sworn statement of May 27 to the NIS, which he had also adopted as part of his testimony. Prior inconsistent statements are a familiar form of impeachment, Mil.R.Evid. 613(b); and so the introduction of the statement could be viewed as impeachment—although, in some respects, discovery was involved.

We recognize that Article 32 grants an accused a broad right of discovery. However, unlike the Drafters' Analysis, we do not believe that this right of discovery precludes the subsequent reception at trial of testimony taken during the pretrial hearing. If anything, this right of discovery suggests the opposite conclusion.

In this connection, a contrast can be drawn between (a) those preliminary hearings where, as in the Federal courts, the purpose is to determine if probable cause exists and (b) those pretrial hearings where the defense also may obtain discovery. In the former, the presiding magistrate may allow very limited opportunity for cross-examination of prosecution witnesses, because he is interested only in determining whether the Government can establish a *prima facie* case against the accused. Thus, the testimony taken at the preliminary hearing may be inadmissible under Fed.R.Evid. 804(b)(1) because of lack of "opportunity" for cross-examination. Even the "motive" for cross-examination may be different when the only purpose of the hearing is to determine probable cause. *Cf. Government of Canal Zone v. P (Pinto),* 590 F.2d 1344, 1352, 1355 (5th Cir. 1979); *United States v. Lynch,* 499 F.2d 1011, 1023 (D.C.Cir.1974).

In *People v. Smith,* 198 Colo. 120, 597 P.2d 204 (1979), the Colorado Supreme Court considered admissibility of a transcript of testimony given at a preliminary hearing by a witness who had become unavailable prior to trial. The court pointed out that "[i]n some states, such as California, the preliminary hearing constitutes a mini-trial." On the other hand, in Colorado "the right to cross-examine and introduce evidence may be curtailed as to matters unnecessary to a determination of probable cause." *Id.* 597 P.2d at 207. Moreover, at the preliminary hearing

> the judge may not make a determination as to the credibility of witnesses unless the testimony is incredible. [Citation omitted.] Consequently, the same motive to inquire as to witnesses' credibility which exists at a jury trial is not present at the preliminary hearing. The multiplicity of the issues at trial contrasts sharply with the single concern of the preliminary hearing. In view of the variance, counsel would not have the same *motive* to cross-examine as at trial. If the matter did not relate to probable cause, counsel also would not have the *right* to present evidence or cross-examine.

*Id.* 597 P.2d at 208.

Unlike the situation in a preliminary hearing in Colorado, the defense in a pretrial hearing under Article 32 is allowed to engage in discovery and may undertake

wide-ranging cross-examination of government witnesses. Thus, the "opportunity" for cross-examination required by Mil.R. Evid. 804(b)(1) and the Sixth Amendment is available. The issue is whether the defense has a "similar motive" to cross-examine the government witnesses—as is required for later admission of the testimony pursuant to Mil.R.Evid. 804(b)(1). *Cf. Hannah v. City of Overland, Missouri,* 795 F.2d 1385, 1390 (8th Cir.1986); *United States v. Feldman,* 761 F.2d 380, 383 (7th Cir.1985); *United States v. Atkins,* 618 F.2d 366, 373 (5th Cir.1980).

The officer who conducts a pretrial investigation under Article 32 not only concludes "whether reasonable grounds exist to believe that the accused committed the offenses alleged" but also must submit his "recommendations ... including disposition." *See* RCM 405(j)(2)(H) and (I), 1984 Manual, *supra;* and Drafters' Analysis at A21–23. Thus, the defense will have a "motive" to bring out by cross-examination or otherwise any circumstances that might induce the convening authority to dismiss the charges or refer them to a court-martial of limited jurisdiction.

■ We recognize that occasionally—for tactical reasons—defense counsel will choose to waive the Article 32 hearing or will cross-examine government witnesses sparingly. *See, e.g., California v. Green,* 399 U.S. 149, 189, 90 S.Ct.1930, 1951, 26 L.Ed.2d 489 (1970) (Brennan, J., dissenting); *United States v. Crockett,* 21 MJ 423 (CMA), *cert. denied,* 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986). Often impeachment will be reserved until the witness appears at trial, because then it will be more effective and the witness will have no chance to prepare a defense against the impeaching evidence. Moreover, during a pretrial hearing, defense counsel may decide not to cross-examine government witnesses because of a concern that, in doing so, he will reveal the defense case. Nonetheless, as we interpret the requirement of "similar motive," if the defense counsel has been allowed to cross-examine the government witness without restriction on the scope of cross-examination, then the provisions of Mil.R.Evid. 804(b)(1) and of the Sixth Amendment are satisfied, even if that opportunity is not used, and the testimony can later be admitted at trial.

**B**

■ Mil.R.Evid. 804(b)(1)—unlike its counterpart, Fed.R.Evid. 804(b)(1)—expressly requires that the record of the former testimony given in the Article 32 proceeding be "verbatim." In this case, defense counsel specifically objected that, for the most part, Schultz' testimony consisted of adoption of his earlier statements; and he contended that those statements should not be received in evidence. The military judge remarked in this connection that "it's difficult for me to separate what was adopted and what was said in court, and I will not attempt to do that because what is said in court then makes little or no sense." Our examination of the former testimony makes clear that his observation was correct and that the testimony, without the statements which Schultz "adopted," would be incomprehensible.

We recognize that often, as a matter of convenience, Article 32 officers rely heavily on the pretrial statements of witnesses—instead of having counsel present the contents of the statements in question-and-answer form. A pretrial statement made to investigators normally would be admissible at trial only if the witness testified that he no longer could remember the events but the statement contained his past recollection recorded, Mil.R.Evid. 803(5), or if the statement were used in cross-examination to impeach him, Mil.R.Evid. 613(b), or, in some circumstances, were used to rehabilitate his testimony. Mil.R.Evid. 801(d)(1)(A) and (B).

In our view, if a defense counsel objects at the pretrial investigation to consideration of a pretrial statement by the witness, the limitations on admissibility of that statement that would apply if it were offered at trial also will apply if the pretrial statement is offered as former testimony because the witness is unavailable. Thus,

the purpose of Mil.R.Evid. 804(b)(1) in requiring a "verbatim" record of former testimony can be achieved. On the other hand, where, as in this case, the defense has not objected at the Article 32 hearing when a witness adopts the pretrial statement as his testimony, we hold that the prior statement is admissible under the former-testimony exception.

Of course, the three defense counsel who appeared at the pretrial hearing not only did not object when government counsel asked Schultz to adopt his pretrial statement of May 27 as his testimony, but then, as part of their cross-examination, they had him also adopt the statement of April 30 as part of his testimony. Under such circumstances, the only relevant issue is whether the defense was provided an adequate opportunity for cross-examination about the contents of the pretrial statements.

C

■ Appellant maintains that he did not have an opportunity for cross-examination at the pretrial hearing because Lieutenant Hodges, the attorney for one of his co-accused, did all the questioning. We see no merit in this contention. The record of the Article 32 hearing makes clear that the other counsel had agreed that Hodges would take the lead but that, if they had additional questions, they could propound them.

Frequently, it is desirable that, to the greatest extent feasible, a single defense counsel do most of the examination of a prosecution witness, even though there may be several accused and each is represented by his own lawyer. Indeed, as we recognized in *United States v. Devitt*, 20 MJ 240, 244 (CMA 1985), the advantanges of coordinated action may be so great that sometimes several co-accused will even prefer to be represented by the same lawyer— despite the possibility of a conflict of interest. When counsel enter an arrangement like that used at the Article 32 hearing in this case, we conclude that each of the co-accused has an "opportunity" for cross-examination within the meaning of Mil.R.

Evid. 804(b)(1). Moreover, under the facts of this case, we see no reason why there would have been a divergence of "motive" among the different accused and their counsel, insofar as the questioning of the government witness, Mark Schultz, was concerned.

D

■ The defense also complains that, after Schultz' testimony had been obtained at the Article 32 hearing, other information was received by the defense as to which they wished to cross-examine him. However, appellate defense counsel has not brought to our attention any significant new information which came into the hands of trial defense counsel after the pretrial hearing and which would have changed markedly his tactics or would have helped him significantly in impeaching Schultz' testimony.

Moreover, we are convinced that here, as in most cases, the former testimony will be admissible even if, after the pretrial hearing, the defense has acquired additional information that might have been used in questioning the witness. In this connection, we note that in *Mattox* the former testimony of the two deceased witnesses was admissible, even though the defense never had an opportunity to ask one of them about certain inconsistent statements he had made *after* testifying at the preliminary hearing.

A different situation might exist if the defense requested information for use in cross-examining a witness at an Article 32 hearing but the requested information was withheld by the Government and not made available to the defense. Under these circumstances, the accused could complain that there had been a violation of his due-process rights, *cf. Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, here no accusation has been made by the defense that the prosecution withheld any information that, if known, would have been used in examining Schultz at the Article 32 hearing.

■ Of course, the defense is free to offer extrinsic evidence to show that the absent witness was biased or had a motive to lie. Mil.R.Evid. 608(c). Also, consistent with the purposes of the confrontation safeguard, we believe that—contrary to the holding in *Mattox*—the military judge has discretion to allow extrinsic evidence of prior inconsistent statements, about which the unavailable witness would normally have been cross-examined if he had testified at trial. Under Mil.R.Evid. 613(b) "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, *or the interests of justice otherwise require.*" (Emphasis added.) Under this Rule, a military judge is free to decide that it will be "in the interests of justice" to allow extrinsic evidence of a statement that is inconsistent with the former testimony of the unavailable witness.

We are convinced, however, that admissibility of the former testimony is not impaired by lack of an opportunity to cross-examine the witness about matters of which the defense has subsequently acquired knowledge, so long as it reasonably can be concluded that the motive for cross-examination at the pretrial hearing was "similar" to that which would have existed if the witness had appeared at trial. In short, "opportunity" to cross-examine does not mean that the cross-examiner have at his disposal all the materials which he might desire. *Cf. Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

### E

■ The Military Rules of Evidence—other than Mil.R.Evid. 301, 302, 303, 305, and Section V—do not apply to pretrial

investigations under Article 32. Mil.R. Evid. 1101(d). In light of this Rule, a defense counsel has no occasion to make some of the objections—such as hearsay objections—that he would make at trial.[7] In our view, Mil.R.Evid. 804(b)(1) does not allow the Government to offer those portions of a witness' former testimony that would be inadmissible if the witness were testifying at trial. However, a specific objection should be made when inadmissible portions of the former testimony are offered at trial.

### F

■ In *Ohio v. Roberts, supra,* the Supreme Court indicated that certain well-established hearsay exceptions will be recognized without any specific requirement that the evidence be shown to be trustworthy—as is required, for example, under Mil. R.Evid. 803(24) and 804(b)(5). Since former testimony is a well-established hearsay exception, there would seem to be no need for the Government separately to establish the reliability of the testimony given by Mark Schultz at the pretrial hearing or for the judge to make a specific finding in this regard.[8] However, we observe that extensive corroborating evidence—such as the three $10 bills and the hashish—was offered at trial to establish that Schultz' former testimony was reliable and amply sufficed for this purpose.

### IV

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

COX, J., concurs.

SULLIVAN, Judge (concurring in the result):

I must first note that this Court did not speak with a single voice in *United States*

---

7. We are not referring to testimony that could be objected to because of matters of form, such as leading questions. Likewise, we do not believe that an earlier statement adopted by the witness during his former testimony—as Schultz did in this case—falls within this principle.

8. We do not at this time exclude the possibility that even former testimony might be inadmissible because it "is unreliable as a matter of law." *See United States v. Burns,* 27 MJ 92, 98 (CMA 1988) (Cox, J., concurring in the result).

*v. Arruza,* 26 MJ 234 (CMA 1988). Accordingly, any support it might provide for the majority opinion's evisceration of Mil. R. Evid. 804(b)(1) is questionable. This rule of evidence promulgated by the President in accordance with Article 36, Uniform Code of Military Justice, 10 USC § 836, requires "opportunity and similar motive" and should be so applied. *See United States v. Carter,* 25 MJ 471, 479 (CMA 1988) (Sullivan, J., concurring in the result). I have examined the record of trial and concluded the requirements of this rule have been satisfied in this case.

In any event, I conclude appellant's conviction should be affirmed on harmless-error grounds. Art. 59(a), UCMJ, 10 USC § 859(a). Chief Master–at–Arms Whalen's testimony concerning this controlled buy, the physical evidence of the drugs, and the marked money render any error in admission of Schultz' testimony harmless. Mil. R.Evid. 103(a), Manual for Courts–Martial, United States, 1969 (Revised edition).